**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:13-cr-00686 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| THOMAS RICHARDSON | ) | |

**MEMORANDUM OPINION AND ORDER**

On December 19, 2018, a jury found Defendant Thomas Richardson guilty of one count of knowing receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and one count of knowing possession of child pornography in violation of § 2252A(a)(5)(B). [167.] On October 6, 2022, this Court sentenced Defendant to a 180-month term of incarceration, a 10-year term of supervised release, and a $200 special assessment. [294.] The Court deferred action on two outstanding issues: (1) the amount of restitution to award the victims of Defendant's crimes under 18 U.S.C. § 2259 and (2) Defendant's objections to Special Condition No. 9, which would place significant restrictions on his use of computers and other internet-connected devices. The Court has carefully considered both issues but will definitively resolve only the latter at this time. The Court imposes Special Condition No. 9 with the modifications explained below. As modified, Special Condition No. 9 imposes no greater deprivation of liberty than is reasonably necessary to advance the three purposes of supervised release—deterrence, public protection, and rehabilitation. Defendant can move for modification if and when it becomes necessary to do so. See 18 U.S.C. § 3583(e).

The restitution issue has proven more complex. The Court's review of the documentation submitted by Defendant's victims has surfaced a number of issues that the Government—as representative of the victims' interests—is encouraged to address. This may require it to

communicate further with the victims and/or their representatives. Should the Government choose to file a supplemental brief either informing the Court of its position on these issues or providing additional information for the Court's review, it must do so by December 14, 2022. If the Government files a supplemental brief, Defendant may file a response by December 21, 2022. In the meantime, in order to minimize additional delay and to expedite resolution of this case, the Court will—pursuant to 18 U.S.C. § 3664(d)(5)—enter judgment on all non-restitution components of Defendant's sentence and defer final determination of Defendant's restitution liability until no later than January 4, 2023.

Under *Manrique v. United States*, 137 S. Ct. 1266 (2017), the judgment the Court enters today is a final judgment and, therefore, must be appealed, if at all, within the period prescribed by Fed. R. App. P. 4(b)(1). When the Court completes its review of the appropriate restitution award in this case, it will issue an opinion explaining its decision and enter an amended judgment specifying the precise amount of Defendant's restitution obligation, if any. Should Defendant take issue with the Court's decision on restitution, he must file a second notice of appeal. *Manrique*, 137 S. Ct. at 1274 ("We hold that a defendant who wishes to appeal an order imposing restitution in a deferred restitution case must file a notice of appeal from that order."); see also *United States v. Harrison*, 823 Fed. App'x 430, 433 (7th Cir. 2020) (noting that where a Defendant files two notices of appeal in a delayed restitution case, he may request that the Seventh Circuit stay briefing on the first appeal and seek consolidation once the restitution order is entered).

## I.     Background

In July of 2013, Department of Homeland Security and FBI investigators downloaded files containing child pornography from a computer with an IP address belonging to Defendant Thomas

Richardson.[1] [1, ¶¶ 14–15]; [174, ¶ 10]; [190, p. 1.] On August 27, 2013, law enforcement officers executed a federal search warrant at a Chicago apartment where Defendant lived alone. [174, ¶ 12.] They found two computers—an Apple Tower G5 and a MacBook Laptop—as well as a G-Tech external hard drive, each of which contained child pornography. [*Id.* at ¶ 12.] Forensic evaluation of these devices revealed roughly 700 images and 60 videos depicting child pornography. [*Id.* at ¶ 14.]

On September 19, 2013, a federal grand jury returned a two-count indictment against Defendant. See [8.] Count One of the indictment alleged that, on or about August 20, 2013, Defendant knowingly received child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). [*Id.* at p. 1.] Count Two of the indictment alleged that, on or about August 27, 2013, Defendant knowingly possessed devices (the two computers and external hard drive) containing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).[2] [*Id.* at p. 2.]

On December 19, 2018, a jury found Defendant guilty of both counts. [167.] Prior to sentencing, five individuals depicted in the images and videos stored on the computers and hard drive seized from Defendant's apartment submitted victim impact statements to the Court. [*Id.* at p. 5.] Two victims took the further step of requesting restitution under 18 U.S.C. § 2259. Lily requested $10,000 and Tara requested $18,136.40.[3] [185.] Each request is accompanied by supporting documentation. See [182], [202], [297.] In addition to these requests, the Probation Office recommended that the Court impose five mandatory, ten discretionary, and seven special conditions of supervised release. [199.]

---

[1] He made those files available for download on BitTorrent, a peer-to-peer file sharing application. [1, ¶¶ 5–13]; [174, ¶ 10.]

[2] Count One was premised on Defendant's receipt of a folder titled "AG-120," which contained images distinct from those Defendant was alleged to have possessed under Count Two. [129, p. 1.]

[3] "Lily" and "Tara" are pseudonyms used by each victim to preserve anonymity.

The Court held an initial sentencing hearing on November 6, 2019. [204.] At that hearing, Defendant did not object to the imposition of restitution but did object to the amount requested by the Government. [276, 66:15–67:16.] The Court tabled the issue for a final sentencing hearing scheduled for November 20, 2019. At that hearing, however, Defendant refused to proceed with his lawyer and orally moved to terminate that representation. [277, 3:7–6:3.] The Court granted the motion and appointed new counsel. [207.]

In part due to the Covid-19 pandemic and in part due to Defendant's pursuit of additional legal challenges, the next sentencing hearing was not held until September 29, 2022. [293.] At that hearing, the Court calculated the Sentencing Guidelines range for Defendant's offense conduct, heard argument from each side on the application of the 3553(a) factors to Defendant, heard Defendant's allocution, and considered objections to Defendant's conditions of supervised release. As in his first sentencing hearing, although Defendant did not object to the imposition of restitution, he did not agree with the Government on the appropriate amount.

A final sentencing hearing was held on October 6, 2022. [294.] At that hearing, the Court sentenced Defendant to a 180-month term of incarceration, a 10-year term of supervised release, and a $200 special assessment. In light of Defendant's indigency, the Court did not impose a fine.

Two issues were not resolved at the October 6 hearing:

- First, because the parties continued to disagree on the appropriate restitution award, the Court deferred imposing restitution so that it could take a closer look at the issue. The Government requested that the Court impose the full $28,136.40 requested by Lily and Tara. Defendant requested that the Court impose the average amount of restitution awarded to Lily and Tara in other cases, $7,541.66 and $4,184.41, respectively, for a total of $11,726.07.
- Second, Defendant objected to the scope of Special Condition No. 9.

For the reasons stated below, the Court will modify Special Condition No. 9 to increase clarity and minimize potential over-inclusiveness. On the issue of restitution, however, the Court's review of the documentation submitted by Defendant's victims has surfaced a number of issues, outlined below, that the Government is encouraged to address. Failure to do so may preclude the Court from awarding restitution.

## II.     Special Condition No. 9

Conditions of supervised release play an important role in facilitating the reintegration of the formerly incarcerated into the community. See *United States v. Neal*, 810 F.3d 512, 519 (7th Cir. 2016) ("The point of supervised release is to rehabilitate persons discharged from prison and to assist their law-abiding return to society."). They may do so by deterring Defendants from re-offending or by providing Defendants with rehabilitative services. In a case like this one, they may also protect the public from the potentially serious consequences of a Defendant's failure to rehabilitate. *Id.* ("Protection of the public from further crimes by the defendant is also an important goal of supervised release.").

There is no doubt, however, that although conditions of supervised release serve important ends, they can be onerous and impose on basic freedoms. The law attempts to balance these competing interests by requiring that conditions of supervised release "involve[] no greater deprivation of liberty than is reasonably necessary for the purposes set forth in [18 U.S.C. §] 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)"—deterrence, public protection, and rehabilitation—determined in light of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3583(d)(1)–(2); *id.* § 3553(a)(1).

Special Condition No. 9—which would place wide-ranging restrictions on Defendant's freedom to access and use computers, external storage devices (like external hard drives), and other devices connected to the Internet—must be assessed in light of this standard. [199, p. 5.]

Two portions of the condition, which contains numerous sub-parts, remain at issue. First, Special Condition No. 9 would require Defendant to obtain the approval of his probation officer before possessing or using any device connected to the internet, whether at home, work, or anywhere else. In relevant part, the condition orders that Defendant

> shall not possess or use at any location (including [his] place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system.

[*Id.*]

Second, Special Condition No. 9 imposes a computer monitoring requirement that would require Defendant to permit the United States Probation Office to place computer monitoring software, at his expense, on all computers to which he has access. [*Id.*] In relevant part, the condition orders that Defendant

> shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. [He] shall consent to the installation of computer monitoring software on all identified computers to which [he has] access. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. [He] shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

[*Id.*]

Defendant objects to both the pre-approval and computer monitoring requirements. With respect to the pre-approval requirement, Defendant submits that, in light of the ubiquity of

computers and internet-connected devices, this language is unjustifiably over-inclusive. At the October 6, 2022, sentencing hearing, Defendant illustrated his concerns with a hypothetical trip to a fast food restaurant. Many such restaurants now permit, or even require, customers to order through electronic kiosks, which may transmit information to kitchen staff over the restaurant's private Wi-Fi network. Defendant argues that the plain language of Special Condition No. 9's pre-approval requirement would cover such a kiosk and prevent him from ordering fast food without the permission of his probation officer. Such a requirement would seem to find little justification in any of the purposes of supervised release.

With respect to the computer monitoring requirement, Defendant objects on two grounds. In his sentencing memorandum, Defendant objects that "restricting and recording every use of a computer or of the internet impacts every aspect of modern life," and that the special condition would permit probation officers to pry into such personal details as "who [he] votes for, what charities he supports, and other private matters that have nothing to do with the offense in this case." [290, p. 15.] At sentencing, moreover, Defendant argued that the capaciousness of the word "computer" would it make it very difficult for him to comprehensively inventory every such device to which he has access.

Defendant's objections merit careful consideration, particularly in light of the unprecedented degree to which internet-connected devices have embedded themselves into the daily rhythms and routines of modern life. As far back as 2007, the Third Circuit recognized the "difficult[y]" of "tailor[ing] conditions of supervised release to the specifics of an offense involving computers and the internet . . . given the extent to which computers have become part of daily life and commerce." *United States v. Voelker*, 489 F.3d 139, 148 (3d Cir. 2007). This trend has only accelerated in the fifteen years since, during which time the number and variety of

devices connected to the internet has increased dramatically. See IoT Analytics, *2022: Connected Devices Growing 18% to 14.4 Billion Globally*, IoT FOR ALL (Sept. 1 2022), https://www.iotforall.com/state-of-iot-2022 (reporting that the number of devices connected to the internet is "expected to grow 18 percent to 14.4 billion active connections" by the end of 2022).

As internet-connected devices continue to proliferate, conditions that impose blanket restrictions on a Defendant's freedom to interact with them will have increasingly significant consequences, some perhaps unintended. Therefore, some care is required to ensure that such restrictions—which are warranted only insofar as they promote the ends of deterrence, rehabilitation, and public protection—do not have the unintended effect of prohibiting Defendants from engaging in daily activities that have no bearing on recidivism.

The Court emphasizes at the outset that Special Condition No. 9, including the pre-approval and computer monitoring requirements, advances all three purposes of supervised release and is, therefore, appropriate as a general matter. First, close monitoring of Defendant's post-release computer use will deter him from re-offending, or at least make it more difficult for him to do so. It is a reasonable prediction that as the odds of detection rise, the likelihood of recidivism falls. Second, in the event that Defendant does re-offend, computer monitoring would protect the public by limiting the extent of, and mitigating the damage caused by, such recidivism. Finally, by limiting the conditions under which Defendant can access computers and other technology, Special Condition No. 9 will promote rehabilitation by driving a wedge between Defendant and the technologies through which he committed the present offenses.

The Court's conclusion that the pre-approval and computer monitoring requirements would promote the ends of supervised release is bolstered by the nature and circumstances of the present offense and the history and characteristics of Defendant. The Court is cognizant of the fact that

Defendant committed the present offenses after serving a 9-year sentence for a similar offense. [174, ¶ 45.] The fact that this sentence was insufficient to deter him from reoffending is significant. Furthermore, the nature of Defendant's present offenses suggests a familiarity with technology that renders close scrutiny of his future computer-use necessary. Law enforcement officers found roughly 700 images and 60 videos depicting child pornography on three separate devices seized from Defendant's apartment. [174, ¶ 14.] These images and videos were obtained (and shared) using sophisticated peer-to-peer file-sharing software. [*Id.* at ¶¶ 10, 28.] Forensic analysis of Defendant's devices, moreover, uncovered "remnants of files" that had been deleted by Defendant. [190, p. 4.] In light of both Defendant's use of multiple computers to commit the present offenses and his apparent efforts to erase his digital tracks, the need for monitoring and other restrictions on his use of technology on release is manifest, notwithstanding any invasion of privacy this might entail.

Although the Court finds that both the pre-approval and computer monitoring requirements are warranted in this case, Defendant's objections to potential over-inclusivity raise concerns. The Court is obligated to impose conditions that "involve[] no greater deprivation of liberty than is reasonably necessary" to serve the purposes of supervised release. 18 U.S.C. § 3583(d)(2). The challenge in a case like this, where open-ended language threatens to prohibit conduct far afield from a condition's intended scope, is to limit potential overbreadth without undermining the capacity of a condition (and the probation officer implementing it) to respond to developments unforeseeable at sentencing.

"'[A] judgeship does not come equipped with a crystal ball,' so predictions about appropriate conditions of supervised release are imperfect." *Neal*, 810 F.3d at 519 (7th Cir. 2016) (quoting *United States v. Kappes*, 782 F.3d 828, 838 (7th Cir. 2015)); see also *United States v.*

*Thompson*, 777 F.3d 368, 374 (7th Cir. 2015) (observing that sentencing judges must "guess at the time of sentencing what conditions are likely to make sense in what may be the distant future"). The consequences of an erroneous prediction can be severe, particularly if a judge's attempt to narrowly tailor a condition disables a Defendant's probation officer from taking measures necessary to protect the public.

For these reasons, efforts to clarify the scope of conditions of supervised release at sentencing, years before they ultimately take effect, must be tempered with respect for the unpredictability of the future. In this case in particular, the Court is acutely aware of the breakneck pace of technological change and the risk that such change will exacerbate the problems identified by Defendant with Special Condition No. 9, as written. But the Court is also concerned that any modification it adopts today might render the condition inadequate to respond to unforeseeable changes in the world.

The Court will attempt to thread this needle by explicitly carving out—from both the pre-approval and computer monitoring requirements—devices that Defendant could not conceivably use to re-offend, but without otherwise attempting to define words in a manner that might unintentionally exclude presently-existing or future technology the use of which should be curtailed in the interests of deterrence, public protection, or rehabilitation.

With these twin goals in mind, the pre-approval requirement will be modified as follows:

> You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device *through which you could* ~~with~~ access ~~to~~ the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system. *This condition does not apply to a device that is only incidentally connected the Internet for a limited purpose, such as a fast food kiosk connected to a restaurant's Wi-Fi network, so long as you cannot use it to access search browsers; communicate online;*

10

*download, upload, or store images, videos, or audio files; or otherwise view pornographic imagery.*

As modified, the condition would permit Defendant to interact in his daily affairs with internet-connected devices that Defendant is incapable of using to re-offend. The core purpose of this condition is to require Defendant to seek the approval of his probation officer before using or possessing any device possessing problematic functionalities, like the capacity to browse the Internet, communicate with others, or store user-uploaded images. This purpose is not furthered by a restriction encompassing devices that, although connected to the Internet, have no function that could even arguably implicate the need for deterrence, public protection, or rehabilitation.

The Court emphasizes that the relevant criterion is a device's potential *functionality*. The Court does not attempt today any definition of what counts or does not count as a computer, storage device, or other device connected to the internet. The scope of these words must remain broad enough to encompass unforeseeable technological developments. When deciding whether pre-approval is necessary, Defendant should ask whether an Internet-connected device would give him the capacity (and, therefore, the discretion) to re-offend. If it does not, he may interact with it without the approval of his probation officer. Of course, if Defendant is in any serious doubt about a particular device, it would be wise to ask for permission to use it anyway. Nevertheless, the condition, as modified, accommodates the probation officer's need for oversight with the increasingly connected world in which everyone, including Defendant, must live.

The computer monitoring requirement, for its part, will be modified as follows:

You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall *identify computers to which you have access and* consent to the installation of computer monitoring software on all ~~identified~~ *such* computers, ~~to which you have access~~ *in the discretion of your probation officer*. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat

11

conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software. *You are not required to identify a computational device, like a four-function calculator or a microwave, that you could not use to access the internet; to upload, download, store, transfer, or otherwise view, watch, or listen to imagery, videos, or audio files; or to communicate with others*.

At sentencing, the Government requested that the computer monitoring requirement be phrased in a manner that places an affirmative burden on Defendant to identify the computers to which he has access. This is a sensible request, as Defendant will be in a far better position to know that information than his probation officer.

Aside from this change, the Court will make two other modifications. First, instead of attempting to define "computer," which, for the reasons explained above, would be unwise, the Court will carve out from the identification requirement devices that are functionally incapable of use by Defendant to re-offend. The point is simply this—if Defendant even arguably could use a given piece of computational technology (*i.e.*, a device with a computer processor) to violate his conditions or recidivate, Defendant must bring it to the attention of his probation officer so he can decide whether or not monitoring is warranted and, if so, what kind. But Defendant need not worry that a failure to identify *every* device that is arguably a computer[4] will violate this condition, so long as he identifies those that implicate the core concerns of supervised release. Finally, the Court will make explicit that monitoring software need not be installed on every computer identified by

---

[4] Definitions of "computer" in the U.S. Code are extremely broad and would likely encompass everything from an alarm clock to a microwave. See, *e.g.*, 18 U.S.C. § 1030(e)(1) ("[T]he term 'computer' means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device.").

Defendant, only those that his probation officer determines possess functionalities that necessitate monitoring.

Even as modified, this condition remains broad. Defendant would be obligated, for instance, to inform his probation officer of his possession of a video game console, like an Xbox or PlayStation, most printers, and other common devices. The modifications only make clear what was likely already intuitive—that Defendant is not required to inventory every item in his possession with a CPU, only those that his probation officer may need to monitor for misuse.

The Court concludes that Special Condition No. 9, as modified, "involves no greater deprivation of liberty than is reasonably necessary" to serve the purposes of supervised release. 18 U.S.C. § 3583(d)(2). If, in the future, Defendant finds that any of his conditions remain over-inclusive in actual application, he may always file a motion for modification under 18 U.S.C. § 3583(e). Indeed, this is typically the preferred course. As the Seventh Circuit recognized in *United States v. Neal*, "Section 3583(e)(2) accommodates" the "uncertainties" present at sentencing "by . . . giv[ing] . . . district judges a mechanism to ensure that the conditions they impose remain relevant and beneficial." 810 F.3d at 519.

## III. Restitution

Restitution in this case is governed by 18 U.S.C. § 2259. "Enacted as a component of the Violence Against Women Act of 1994," this provision requires courts to order restitution to the victims of any offense committed under Chapter 110 of Title 18 of the U.S. Code. *Paroline v. United States*, 572 U.S. 434, 439 (2014). Because 18 U.S.C. § 2252A is part of Chapter 110, both of Defendant's offenses are covered.

Defendant has never objected to the imposition of some amount of restitution. However, Defendant and the Government have not been able to reach agreement on the precise amount of restitution appropriate in this case. At the sentencing hearing held on October 6, 2022, the Government requested that the Court impose the full $28,136.40 requested by Lily and Tara. Defendant, on the other hand, argued that the Court should impose the average amount of restitution awarded to Lily and Tara in other cases—$7,541.66 and $4,184.41, respectively.

Because of this disagreement, the Court must determine for itself (1) the aggregate losses suffered by each victim as a result of "the continuing traffic in [her] images" and (2) the proportion of those losses Defendant should be ordered to pay in light of "the relative causal significance of [his] conduct in producing those losses." *Paroline*, 572 U.S. at 460. To this end, the Court has carefully reviewed the materials submitted by each victim to support her claimed losses as well as information bearing on the relative causal significance of Defendant's conduct in this case.[5]

In conducting this review, the Court has identified three issues with the information submitted by Defendant's victims that may make it difficult for the Court to award restitution in this case. Although it is true that 18 U.S.C. § 2259 manifests a strong Congressional policy of compensating the victims of child pornography offenses, the Government ultimately bears "[t]he burden of demonstrating the amount of the loss sustained by [each] victim as a result of" Defendant's offense conduct. 18 U.S.C. § 3664(e); see also 18 U.S.C. § 2259(b)(3) ("An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A."). As things currently stand, the Court is not

---

[5] The Probation Office included Lily's supporting materials in a supplement to Defendant's Presentence Investigation Report. For reasons unknown to the Court, that supplemental PSR was not filed on the docket, though four other supplements were. See [182], [185], [199], [202.] The Probation Office has rectified this oversight, and that supplement can be found at [297.]

satisfied that the Government has met its burden of proof with respect to substantial portions of each victim's claimed losses. The Court will now discuss each issue in turn.

### A. Inclusion of Pre-Offense Conduct Losses in Total Loss Figures

For starters, the loss figures submitted by both victims appear to include losses that accrued before Defendant's offense conduct in this case. Tara, for instance, seeks restitution for counseling sessions (and associated mileage) attended from 2008 to 2010, years before the August 2013 offenses at issue in this case. [202, p. 7.] She also seeks restitution for pre-2013 insurance premiums and the cost of moving from her childhood home due to harassment that she experienced in 2012. [*Id.*] Lily's supporting documentation similarly fails to disaggregate pre-offense conduct losses (*e.g.*, her lost part-time income during college) from her claimed total loss figure of $4,517,390.13. [297-1, pp. 2, 203.]

Several district courts have held that a victim's total loss figure should not include costs accrued before a defendant's offense conduct. In *United States v. Lloyd*, for instance, the court was presented with a request for restitution from Tara that bore many similarities to the request in this case. 2020 WL 4038241, at *4 (N.D. Ohio June 17, 2020). Observing that Tara's total loss figure "include[d] costs that she incurred before Defendant's conduct" in that case, the court felt compelled to subtract those pre-offense conduct losses. *Id.* The following analysis is highly relevant to this case:

> Tara's losses include costs for counseling sessions dating back to 2010 through 2012; insurance premiums dating back to 2008; and costs associated with housing dating back to 2012. . . . Tara incurred all of these costs prior to Defendant's conduct. . . . After subtracting the[se] costs . . . the Court finds Tara's reasonable estimated losses to be $40,000.

*Id.* at *4–5.

Similarly, in *United States v. Moody*, the court held that "causation [could not] exist" between the Defendant's conduct in that case and "losses [that] occurred long before th[e] Defendant was arrested . . . ." 2018 WL 3887506, at *8 (S.D. Ga. Aug. 15, 2018). Although the Court thinks that the relevant date for the purposes of loss attribution is the date of a Defendant's offense conduct, rather than the date of arrest, the point that a Defendant should not be ordered to pay restitution for pre-offense conduct losses remains.

The Court agrees with the approach taken by these courts and is not inclined to include pre-offense conduct losses in the aggregate loss amounts to which it will apply *Paroline*'s relative causation standard. Should the Government disagree with the Court's approach to calculating aggregate loss, it is encouraged to explain why. Otherwise, it would be helpful for the Government (either on its own or with the help of the victims and/or their representatives) to determine each victim's total post-offense conduct losses. Many categories of losses claimed by Lily and Tara are not broken down into year-by-year amounts. For example, Tara claims $1,330.00 in losses for the cost of a PO box she has used to avoid harassment, but does not explain what amount of that expense accrued after August 2013. [202, p. 7.] Without such information, the Court is unable to determine the portion of that amount for which Defendant can lawfully be held accountable.

### B.     Tara's Vague Loss Descriptions

The second issue is specific to Tara. Before the Court reaches that issue, however, it observes an apparent discrepancy in the record that the Government is encouraged to rectify or otherwise clarify. On October 7, 2022, this Court "request[ed] any information the parties may possess bearing on" the application of *Paroline* to the present case. [296.] In response to that request, the Government provided the Court with materials supporting Lily and Tara's respective

restitution requests.[6]  None of this information had been filed on the docket at that time.  As noted above, Lily's information was included in a supplemental PSR that was inadvertently not docketed until November 9, 2022.  See [297.]  And although Tara had previously supported her request with materials included in two supplements to Defendant's PSR, see [182, pp. 16–21] and [202.], the most recent materials provided by the Government substantially differ from each of these supplements.  For example, the most recent request provided by the Government claims $147,148.78 in total losses, rather than the $37,008.78 sought in each PSR supplement.  The updated request also claims losses for, among other things, projected future counseling expenses.

Under 18 U.S.C. § 3664(a), the Probation Office is required "to . . . include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order."  Under 18 U.S.C. § 3664(b), moreover, the Court "shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) . . . ."  The Court would like to consider Tara's updated restitution request.  However, in order for it to do so, that information must be filed on the docket in a supplemental report.  If the Court has simply overlooked something in the docket, the Government is encouraged to point the Court's attention to the relevant docket entries.  In any case, because the updated request suffers from the same deficiencies as Tara's initial request, the issues flagged by the Court in this opinion apply with equal force to the updated request.

With that noted, several of Tara's loss categories are either vaguely described or insufficiently explained.  For instance, Tara seeks $2,688.00 for insurance premiums ($7,514.00

---

[6] Defendant's counsel was carbon copied on this email, and had access to the attached files.

in her updated request) but does not explain how online trafficking in her images has caused those losses or even what they represent. [202, p. 7.] The Court cannot determine, for instance, whether the $2,688.00 reflects an increase in Tara's premiums, perhaps caused by medical issues exacerbated by the knowledge that images and videos of her abuse have been, and will continue to be, shared online. Or perhaps it reflects the absolute cost of an insurance policy that Tara would not otherwise have needed (a more comprehensive plan covering psychotherapy, for instance). The Court assumes the former but cannot know without a clearer explanation.

Tara's claim that she has had to spend $22,400 ($95,000 in her updated request) for temporary housing suffers from a similar problem. Although Tara has explained that she had to move from her childhood home in 2012 due to harassment, [202, p. 5], none of her requests explains how this move has cost her $22,400. Tara's initial request stated that this loss accrued at a rate of $200 per month since the move. [*Id.* at p. 7.] Although this suggests that the $22,400 might represent the aggregate rent she had to pay after her move, the Court has no way of knowing this for sure without a clearer explanation. Tara's updated request seeks an additional $72,600 for this loss category. That request drops the $200 per month figure and does not otherwise explain what caused the cost of housing to spike by so much. Without more, it would be difficult for the Court to conclude that the Government has satisfied its burden of proof under 18 U.S.C. § 3664(e).

### C.      Lily's Claimed Lifetime Medical Expenses

The final issue concerns Lily's claim that she will suffer $3,266,093.00 in increased lifetime medical costs (disaggregated to exclude those caused by her initial abuse) as a result of the online traffic in images and videos of her abuse. [297-1, p. 2.] She supports this figure with an expert report by Dr. Sharon W. Cooper, who specializes in the effects of childhood trauma and abuse on mental and physical health. [*Id.* at pp. 36–45.]

The report explains that the circulation of images of Lily's abuse online has led to a chronic increase in levels of cortisol circulating in her system. [*Id.* at p. 39, ¶ V.] Cortisol is a stress hormone that can exacerbate pre-existing health conditions. Lily suffers from a number of medical issues, some of which "preceded" and some of which "began after" the circulation of images of her abuse online. [*Id.*] Lily's conditions include (1) asthma; (2) endometriosis; (3) migraine headaches; (4) seizure disorder; (5) Raynaud's syndrome; (6) bilateral entrapment neuropathies in her wrists and ankles; (7) degenerative spinal disc and scoliosis with chronic back pain; (8) hypothyroidism; and (9) intermittent insomnia. [*Id.* at p. 40, ¶ VI.] Dr. Cooper estimates that chronically increased levels of cortisol in Tara's system will increase the cost of treating these conditions by more than $3 million dollars. [*Id.* at pp. 41–42, ¶¶ XII–XIII.]

The basis for this estimate is not entirely clear, particularly in light of the fact that Dr. Cooper's report does not provide in-line citations or footnotes to supporting medical or scientific literature. Paragraph XII contains a table listing each of Lily's conditions and the projected increase in the lifetime cost of treating each condition caused by increased levels of cortisol in her system. [*Id.* at p. 41, ¶ XII.] The table's projection for the cost of treating Lily's asthma is typical. It estimates that the online trafficking in images of Lily's abuse will increase the cost of treating her asthma "$10,280/year" over "60 years" for an aggregate increase of $616,800. [*Id.*] This projection is not supported with any citation to medical or scientific literature, and Dr. Cooper does not otherwise attempt to explain how she arrived at that figure.

Although the Court is concededly ill-suited to assess Dr. Cooper's expert predictions, it nevertheless must ensure that the report is sufficiently reliable to satisfy the Government's burden of proof under 18 U.S.C. § 3664(e). The Court is not inclined to simply accept Dr. Cooper's unsubstantiated conclusions. It is not enough that the report lists Dr. Cooper's sources in its final

two pages.  Without specific references to specific support in the medical or scientific literature for *each* of Dr. Cooper's claims, the Court cannot satisfy itself that the predictions are based on a reasonable methodology.

In *United States v. Erickson*, Judge Schiltz, when presented with the same report, expressed similar concerns.  388 F. Supp. 3d 1086, 1094 (D. Minn. June 27, 2019).  His observations bear emphasis.

> The Court does not doubt that stress can worsen pre-existing medical conditions, but the Court does not believe that [Lily's][7] expert has sufficiently explained how the stress that [Lily] will experience as a result of the ongoing trafficking of her images will cause each of these medical conditions to worsen over time.  For example, the evidence in the record does not allow the Court to find that the trafficking of [Lily's] images will somehow increase the amount of treatment that she will need to receive for her degenerative spine.  Perhaps more importantly, the Court does not believe that [Lily's] expert has adequately explained or supported the particular amounts that she has estimated.  For example, the Court does not doubt that stress from the trafficking of [Lily's] images could increase her need to seek treatment for migraine headaches, but the Court has no idea why the expert estimates that [Lily] will spend an additional $7,000 per year for those treatments over the next 60 years—as opposed to, say, an additional $3,500 per year over the next 10 years, or an additional $14,000 per year over the next 30 years.  Similarly, the Court does not doubt that stress from the trafficking of [Lily's] images could increase her need to get medical help for insomnia, but the notion that [Lily] will need to spend almost a million dollars getting sleep-management help over the next 60 years is difficult to accept, especially as the expert does not explain how she arrived at that rather startling estimate.  In short, the expert's estimates of increased medical costs are unduly speculative and insufficiently explained and documented.

*Id.*  For these reasons, Judge Schiltz deducted the totality of the $3,266,093.00 claimed by Lily for increased lifetime medical costs from her total loss amount.  *Id.* at 1094–95.  Because Lily had already received restitution payments sufficient to pay the remaining losses, he did not order the Defendant in that case to pay restitution.  *Id.* at 1095.

---

[7] In previous cases, Lily used a different pseudonym.  Seeking distance from this pseudonym, she has requested that courts now refer to her as Lily.  [297-1, p. 1].  The Court will honor that request.  The brackets in this block quote substitute her preferred pseudonym for her old pseudonym.

Barring further support for the $3,266,093.00 in increased lifetime medical costs sought by Lily, the Court is inclined to deduct it from Lily's total loss figure. The Court presumes that Lily has already received the $1,251,483.00 in losses that would remain, as the Court in *Erickson* found she had already received $1,588,094 at the time of that opinion.[8] *Id.*

## IV.    Conclusion

The Government is encouraged to provide its own view on this issue as well as the others the Court has identified in this opinion. Should it choose to file a supplemental brief or provide the Court with additional information, it must do so by December 14, 2022. The Defendant will then have until December 21, 2022, to respond. Final judgment will be entered on all other components of Defendant's sentence.


Dated: November 30, 2022

Robert M. Dow, Jr.
United States District Judge

---

[8] If the Government has information on hand documenting the number of restitution orders that have been entered in favor of Lily and Tara to date, that information would prove useful—both in determining whether there are outstanding losses to be compensated and in applying the *Paroline* factors to those losses, if any. See, *e.g.*, *United States v. Lloyd*, 2020 WL 4038241, at *4 (N.D. Ohio July 17, 2020) ("[A]s of March 12, 2020, Tara has received 123 restitution orders, ranging from $200 to $18,136.40.").