**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:13-cr-00686 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| THOMAS RICHARDSON | ) | |

**MEMORANDUM OPINION AND ORDER**

On December 19, 2018, a jury found Defendant Thomas Richardson guilty of one count of knowingly receiving child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and one count of knowingly possessing child pornography in violation of § 2252A(a)(5)(B). [167.] Prior to sentencing, five individuals depicted in the images and videos stored on computers and a hard drive seized from Defendant's Chicago apartment submitted victim impact statements to the Court. [182.] Two victims—Lily and Tara[1]—took the further step of requesting restitution under 18 U.S.C. § 2259. Lily requested $10,000 and Tara requested $18,136.40. [185.] Each request is accompanied by supporting documentation. See [297-1] (Lily); [312] (Tara).[2]

On October 6, 2022, the Court sentenced Defendant to a 180-month term of incarceration, a 10-year term of supervised release, and a $200 special assessment. [294.] At that hearing, the parties were unable to agree on an appropriate restitution award. The Government sought restitution in the entire amount requested by the victims. Defendant asked the Court to impose

---

[1] "Lily" and "Tara" are pseudonyms used by each victim to preserve anonymity.

[2] Tara has provided two sets of supporting documentation in this case. She originally claimed $37,008.78 in total losses. The materials she filed in support of that claim are included in two supplements to Defendant's Presentence Investigation Report ("PSR"). [182] (second supplement to the PSR); [202] (fifth supplement to the PSR). Tara later provided the Government with an increased request supported by new documentation. The Government provided those materials to the Court and counsel for the Defendant in an email sent on October 14, 2022. According to the Government, they were also provided to the Probation Office prior to sentencing. [309, 2 n.2.] For some reason, the updated request was not promptly docketed. It is now docketed at [312].

restitution in the average amount awarded to Lily and Tara in other cases—$7,541.66 and $4,148.41, respectively.[3]  Because the parties ultimately could not reach consensus, they agreed to leave the issue to the Court.  After sentencing, the Court carefully reviewed the documentation submitted by each victim to support their respective restitution requests.  That review turned up three major deficiencies in the victims' submissions.  See [300, 15–21.]

First, both sought recovery for losses that accrued prior to Defendant's offense conduct in this case, and the Court tentatively agreed with several courts that have held that a court may not order a Defendant to pay restitution under 18 U.S.C. § 2259—as interpreted by the Supreme Court in *Paroline v. United States*, 572 U.S. 434 (2014)—for such losses.  [300, 15–16]; see, *e.g.*, *United States v. Lloyd*, 2020 WL 4038241, at *4 (N.D. Ohio July 17, 2020); *United States v. Moody*, 2018 WL 3887506, at *8 (S.D. Ga. Aug. 15, 2018); *cf. United States v. Sainz*, 827 F.3d 602, 605 n.1 (7th Cir. 2016) (emphasizing that the victim's "total loss amount . . . includes only expenses incurred after the defendant's offense conduct").  The common-sense rationale behind these decisions is that a Defendant's crimes cannot have had any "causal significance" in "producing" pre-offense-conduct losses.  *Paroline*, 572 U.S. at 460.

Second, Lily claimed more than $3 million in losses for the long-term effect that trafficking in images of her abuse will have on the cost of treating several of her medical conditions.  However, she supported this figure with an expert report lacking indicia of reliability.  [300 at 18–21.]  The report did not explain the basis for most of its conclusions, and the absence of in-line citations or footnotes to relevant medical or scientific literature made it exceedingly difficult for the Court to assess the expert's methods, assumptions, and reasoning.  In light of these omissions, the Court

---

[3] As of December 14, 2022, those averages have increased for Lily ($11,159.68) and decreased for Tara ($3,601.34).  [309, 1–2, n.1.]

was skeptical the report satisfied the Government's burden to prove those losses by a preponderance of the evidence. See 18 U.S.C. § 2259(b)(2) ("An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A."); *id.* § 3664(e) ("The burden of demonstrating the amount of the loss sustained by the victim as a result of the offense shall be on the attorney for the Government.").

Third, Tara did not clearly explain the mechanism underlying many of her claimed losses. [300 at 16–18.] For instance, she sought recovery for "2008–2019 insurance prem" without explaining whether she was requesting restitution for the full amount of her insurance premiums, for an increase in her premiums attributable to her initial abuse, or for an increase in her premiums attributable to her knowledge that images of her abuse were circulating online. [312, 5.] Without such information, the Court could not even attempt determine the cause of those expenses. But such information is crucial to the analysis demanded by *Paroline*. 572 U.S. at 449 (emphasizing that a victim's total losses may include only those proximately resulting from "traffic in her images as a whole," rather than those "result[ing from] . . . the initial physical abuse . . . .") This lack of detail plagued many of Tara's claimed losses and made it very difficult for the Court to understand precisely how Tara suffered damages in the amounts reported.

In light of these deficiencies, the Court expressed doubt that it could impose restitution on the existing evidentiary record. After the aforementioned losses are deducted from the total amount sought by each victim, the remaining losses are less than the total amount of restitution each victim has already received from defendants in other cases. Because section 2259 does not authorize double recovery, the Court feared that it might ultimately lack the authority to award restitution to either victim. See *United States v. Laraneta*, 700 F.3d 983, 989 (7th Cir. 2012) (explaining that, under section 2259, victims' lawyers "should . . . specif[y] the entire amount" the

victim has already "recovered" in other cases "and [that] the district court should then . . . subtract[] that amount" from the victim's total losses).

Reluctant to deny Lily and Tara restitution without providing an opportunity to address these deficiencies, the Court—pursuant to 18 U.S.C. § 3664(d)(5)—entered a partial final judgment on all components of Defendant's sentence except restitution and provided time for the Government to file a supplemental brief either challenging the underlying legal basis for the Court's concerns or providing updated or clarifying information. [300] (memorandum opinion and order); [301] (partial final judgment). The Court cautioned that failure to address the issues flagged by the Court might preclude the Court from awarding restitution to either victim. [300, at 5.]

On December 15, 2022, the Government filed a brief submission informing the Court that it had "contacted representatives for both Tara and Lily," who ultimately "declined to submit additional materials in support" of their respective restitution requests. [309, 2.] Instead, they "indicated that they would both be amenable to agreeing to restitution in the amounts to which defendant" stated he would be willing to pay at the October 6, 2022, sentencing hearing. [*Id.* at 2–3.] Accordingly, the Government now requests that the Court order restitution in that amount. [*Id.* at 3.] Defendant did not file a supplemental brief responding to this updated request.

As a threshold matter, the Court does not consider Defendant bound by the request he made at sentencing, and it will not construe Defendant's failure to respond to the Government's supplemental brief as tacit acceptance of the updated request. The Government rejected the position Defendant took at sentencing. It is precisely this disagreement, coupled with the scant attention restitution received in either party's sentencing memorandum, that required the Court to engage in an independent review of the record.

4

With no basis for imposing any formally agreed amount, the Court must determine for itself an appropriate restitution award on the record before it. The Court expresses its appreciation to the Government for its efforts to seek updated documentation from the victims in this case. Unfortunately, those efforts did not yield much tangibly, so the supporting documentation before the Court continues to suffer from the deficiencies identified in the supplemental briefing order. Accordingly, the Court cannot impose restitution in this case.

I.      **Background**

As the Supreme Court recognized in *Paroline*, a victim's knowledge that anonymous, men—at any given moment and at any given place—may be delighting in the darkest moments of her life, makes "it difficult for her to recover from her abuse." *Paroline*, 572 U.S. at 440. With each download and view, moments of abject terror are replayed for the enjoyment of strangers taking an active, prurient pleasure in the victim's past suffering. "[T]he wrongs inflicted upon" each victim are not simply "repeated" by this process—they are "renewed into the future" so that the past never really dies and victims can never fully heal. *Id.* at 441.

The victim impact statements submitted to the Court by Lily, Tara, and their loved ones attest to this tragic reality and give voice to the devastating harm child pornography offenses inflict upon the physical and psychological well-being of victims. Unlike the victims of most crimes, who can gain a sense of closure and security from the conviction of those responsible, child pornography victims experience a lasting sense of insecurity, fueled by the ever-present threat that, at any time and place, someone who relishes their abuse is near. As the lived experience of Lily and Tara show, these fears are neither irrational nor abstract. Both have been targeted for heinous acts of harassment on account of their respective pasts and, as a result, have felt compelled to withdraw from the public sphere to protect their privacy and to ensure their safety.

5

Without question, Defendant contributed to these injuries. Through his actions, he renewed Lily and Tara's abuse into the future. And by opting into the "large, loosely connected network through which" both victims' "images circulate," he contributed to the prospective strength of the amorphous crowd that continues to undermine Lily and Tara's recovery. *Paroline*, 572 U.S. 452. The long-term survival of that network owes to collective decisionmaking of all consumers of Lily and Tara's images, including Defendant.

As the Court expressed at sentencing, the suffering of victims in cases like this is in many ways incalculable. But in order to award the restitution that victims so desperately need, victims, the Government, and courts alike must do their best to translate the qualitative experiences of victims into dollars and cents. This is a difficult task, and the Government ultimately bears this burden. See 18 U.S.C. §§ 2259(b)(2); 3664(e). No matter how certain a court is that a Defendant has caused victims harm, the Government must be put to its proof. It is this bedrock principle that makes restitution orders "an application of law" rather than "a decisionmaker's caprice." *Paroline*, 572 U.S. at 462 (quoting *Philip Morris USA v. Williams*, 549 U.S. 346 (2007)).

Having recognized the irreparable harm suffered by the victims of Defendant's crimes and Defendant's undoubted contribution to that suffering, the Court will, with reluctance, explain why the Government has not met its burden of proof in this case with respect to substantial portions of Lily's and Tara's claimed losses.

## II.   **Legal Standard**

Lily and Tara seek restitution under 18 U.S.C. § 2259, a provision enacted in 1994 as a component of the Violence Against Women Act, Pub. L. 103–322, 108 Stat. 1902, 1907. That provision provides that district courts "shall order restitution for any offense" committed in

6

violation of Chapter 110 of Title 18 of the U.S. Code, a chapter that criminalizes a variety of crimes against children. 18 U.S.C. § 2259(a). Because both of Defendant's offenses in this case are Chapter 110 offenses, Lily and Tara's restitution requests are governed by section 2259. However, because section 2259 has undergone substantial modification over the years, the Court must first determine which version of the statute to apply in this case. After answering that question, the Court will provide a brief overview of the operative statutory scheme and examine the Supreme Court's decision in *Paroline v. United States*, which directly governs this case.

A. **Applicable Version of Section 2259**

Section 2259 has twice been overhauled by Congress—first, by the Mandatory Victims Restitution Act of 1996 ("MVRA"), Pub. L. 104–132, 110 Stat. 1227, 1231, and, most recently, by the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 ("AVAA"), Pub. L. 115–299, 132 Stat. 4383. The AVAA was enacted in response to *Paroline* and, among other changes, imposes a $3,000 mandatory minimum restitution award applicable to most child pornography offenses. 18 U.S.C. § 2259(b)(2)(B) (2018). It also requires courts to impose a special assessment of up to $17,000 in cases of child pornography possession. *Id.* § 2259A(a)(1).

Defendant was arrested, charged, and convicted in this case for crimes committed in August 2013, years before the AVAA was enacted. [8.] Because the AVAA would clearly operate retroactively if applied to Defendant, the Court must decide whether Congress intended for it to be applied in this manner. *Landgraf v. USI Film Products*, 511 U.S. 244, 269–70 (1994) (holding that a statute applies retroactively where it "attaches new legal consequences to events completed

before its enactment"). Even if Congress intended the AVAA to apply retroactively, a subsequent question arises whether the *Ex Post Facto* Clause forbids retroactive application in this case.[4]

Thankfully, Congress anticipated cases like this one and explicitly staked out a position on this question in the text of the AVAA. 18 U.S.C. § 2259B(d) expresses the "sense of Congress that individuals who violate this chapter prior to the date of the enactment of the [AVAA], but who are sentenced after such date, shall be subject to the statutory scheme that was in effect at the time the offenses were committed." Although that language is tucked away in 18 U.S.C. § 2259B rather than section 2259 itself, it speaks to the AVAA as a collective whole, including the modifications that statute made to section 2259. The Court will, therefore, apply section 2259 as it existed at the time of Defendant's offense conduct.[5]

---

[4] Although criminal restitution is imposed as a component of a criminal judgment, entered at the culmination of criminal proceedings, it is not considered penal in this Circuit. *United States v. Newman*, 144 F.3d 531, 542 (7th Cir. 1998) (holding "that the restitution authorized by" two statutes—the VWPA and MVRA—"is not a criminal punishment for purposes of the Ex Post Facto Clause."). Therefore, the *Ex Post Facto* Clause may not apply to the AVAA's mandatory minimum restitution award. However, the AVAA's mandatory special assessments *are* a form of criminal punishment, and would present constitutional issues. Furthermore, to the extent the mandatory minimum restitution award requires courts to order restitution in amounts exceeding the harm a victim has proven she suffered as a result of a defendant's conduct, it may, in some cases, function more like a criminal fine for constitutional purposes than like traditional restitution. See *Paroline*, 572 U.S. at 455–56 (considering possibility that a restitution order could violate the Excessive Fines Clause of the Eighth Amendment).

[5] The Court is aware of just one court that has applied the AVAA retroactively. See *United States v. Berry*, 2020 WL 86194, at *2 (D. Or. Jan. 6, 2020). That Court held that § 2259B(d) is non-binding "legislative dicta" and applied the AVAA to a defendant for crimes committed before its passage. *Berry* is unpersuasive. Even if § 2259B(d) is a non-binding expression of legislative intent, the default presumption is that where a law "attaches new legal consequences to events completed before its enactment," a court should apply it retroactively only where Congress has made such an "intention clear" in the text of the statute. *Landgraf v. USI Film Products*, 511 U.S. 244, 268, 270 (1994). "When . . . [a] statute contains no such express command," and "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed," "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.* at 280. Even if § 2259B(d) is non-binding, it clearly negates the existence of a clearly expressed congressional intent favoring retroactive application of the AVAA.

B. **An Overview of the Operative Statutory Scheme**

For all the difficulty the pre-AVAA version of section 2259 has caused courts, its text is surprisingly straightforward. As the Court explained above, section 2259(a) requires courts to "order restitution for any offense" committed under Chapter 110 of Title 18 of the U.S. Code. If the language of section 2259(a) was not clear enough, section 2259(b)(4)(A) provides that "[t]he issuance of a restitution order under [section 2259] is mandatory."

Section 2259(b)(1), as defined by sections 2259(c) and 2259(b)(3), provides the core formula for calculating restitution under the statute. It instructs that restitution orders imposed under the statute "shall direct the defendant to pay the victim[s]" of his offense "the full amount of the victim's losses." Section 2259(c) defines victim as any "individual harmed as a result of the commission of a crime under" Chapter 110 and section 2259(b)(3) defines "full amount of the victim's losses" to include six enumerated categories. Those categories cover "any costs incurred by the victim for—

(A) medical services related to physical, psychiatric, or psychological care;

(B) physical and occupational therapy or rehabilitation;

(C) necessary transportation, temporary housing, and child care expenses;

(D) lost income;

(E) attorneys' fees, as well as other costs incurred; and

(F) any other losses suffered by the victim as a proximate result of the offense."

Finally, section 2259(b)(2) provides that orders of restitution imposed under section 2259 "shall be issued and enforced in accordance with [18 U.S.C. §] 3664 in the same manner as an order under section 3663A." By invoking section 3664, section 2259(b)(2) renders section 3664(e)

9

applicable to all requests for restitution under section 2259. That provision provides that "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of [an] offense shall be on the attorney for the Government."

C.      *The* Paroline *Decision*

Prior to the Supreme Court's decision in *Paroline v. United States*, most circuits had held that section 2259 permits courts to award restitution only for injuries caused—both actually and proximately—by each defendant's specific offense conduct. *Paroline*, 572 U.S. at 444 (collecting cases). In *Paroline*, the Supreme Court adopted this view. *Id.* at 448 ("Restitution is . . . proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses.") This conclusion was rooted in the plain text of the statute, which makes clear that, however "strong" section 2259's "restitutionary purpose," *id.* at 461, Congress intended no departure from "the bedrock principle that restitution should reflect the consequences of [a] defendant's own conduct . . . ." *Id.* at 454–55.

In most cases, the twin requirements of actual and proximate causation do not present any special difficulty. However, child pornography offenses are different. The harms that victims suffer from trafficking offenses, including possession, are caused by "the conduct of thousands of geographically and temporally distant offenders acting independently, and with whom the defendant" generally has "had no contact." *Id.* at 455. In such a case, proving traditional but-for causation is impossible, because the victims' harm stems from the collective action of thousands. The involvement of any given participant in that network does not materially add or detract to a victims' injuries. But-for the possession offense of one defendant, most (perhaps even all) of the harm caused to victims by knowledge of the circulation of their images online would remain.

10

The *Paroline* Court recognized that requiring the Government to show traditional but-for causation in the "special context" of child pornography offenses would therefore produce "the nonsensical result" that "individuals hurt by the combined wrongful acts of many . . . would have no redress, whereas individuals hurt by the acts of one person alone would have a remedy." *Id.* at 452. To avoid this result, inconsistent with Congress's clear intent that the victims of child pornography offenses receive restitution, the Court drew on principles of aggregate causation to adopt a modified standard of causation that asks Courts to "assess as best [they] can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id.* at 459.

Having tailored section 2259 to the unusual factual circumstances presented by child pornography offenses, the Court outlined a two-step approach to awarding restitution in these cases. At step one, "the victim [must] prove the aggregate losses . . . that stem from the ongoing traffic in her images as a whole." *Id.* at 449. In other words, courts should add together all losses—proven by the Government by a preponderance of the evidence under 18 U.S.C. § 3664(e)—that proximately result from trafficking in a victim's images, regardless of when they accrued. In most cases, this "general loss" figure, will include losses caused by the "conduct of thousands of geographically and temporally distant offenders" whose collective conduct has contributed to the victim's suffering, *id.* at 455, the only limits on inclusion being (1) the Government's burden of proof and (2) the requirement of proximate causation.[6]

---

[6] The proximate causation inquiry at step one is best understood as asking whether a victim's losses were proximately caused by trafficking in a victim's images as a whole, not whether a victim's losses are the proximate result of the conduct of any particular defendant. Only when a given loss is not a proximate result of trafficking as a whole is it fair to say that it does not comprise some amount of that victim's total loss. Individualized inquiries into whether a specific defendant's offense conduct proximately causes a victim's losses are most appropriate at the second stage, which looks at the causal significance of individual Defendant's actions.

11

At step two, the Court must then "order restitution in an amount that comports with the defendant's relative role in the causal process" giving rise to the general losses calculated at step one. *Id.* at 458. Without setting forth a "rigid formula," the Court enumerated a non-exhaustive list of factors that a Court might consider in making this determination, including

> the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom, of course, will never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's causal role.

*Id.* at 460. The Court recognized that "[t]his cannot be a precise mathematical inquiry" and "involves the use of discretion and sound judgment." *Id.* at 460.

## III. **Discussion**

With this framework in mind, the Court will proceed to assess each victim's restitution request and supporting documentation.

### A. **Lily**

Lily claims that trafficking in images of her abuse will, over the course of her lifetime, cause her to suffer $4,517,390.13 in total losses. [297-1, 2.] She has submitted more than four hundred pages of materials documenting those losses.[7] These materials break her losses down into five categories:

---

[7] A significant portion of these materials is only tangentially related to Lily's specific requests. For instance, expert CVs, comment threads demonstrating the abuse and harassment Lily experiences online, and two full-length opinions add important context to Lily's claims without directly substantiating any claimed losses. The actual expert reports can be found at pages 35–45 (estimated increased medical costs), 137–

1. "disaggregated increased medical costs" ($3,266,093.00);
2. "lost past and future earnings" ($936,646.00);
3. "future counseling expenses" ($164,475.00);
4. "out of pocket costs incurred relative to restitution documentation" ($96,846.13); and
5. "educational and vocational counseling needs and lost part-time income during schooling" ($53,330.00).

[*Id.*]

At step one of the *Paroline* analysis, the Court must determine whether Lily's supporting materials satisfy the Government's burden of proof. It is not enough for the Government to prove that Lily has suffered *some* amount of damages in each category—rather, it must prove that it is more likely than not that she has suffered the *specific amount* of damages that she requests. 18 U.S.C. § 3664(e) ("The burden of demonstrating the *amount* of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government.") (emphasis added).

The Court begins by noting that the expert reports supporting Lily's claims for lost earnings, future counseling expenses, and costs incurred for educational and vocational needs are thorough and reliable. Furthermore, the accounting she has submitted to support her claim for the cost of restitution documentation is exhaustively detailed. Accordingly, the Court finds that Lily's supporting materials are more than sufficient to prove the loss amounts for each of these categories. Together, they total $1,251,297.13.

However, if Lily is to receive restitution in this case, she must also prove that it is more likely than not that she will suffer $3,266,093.00 in increased medical costs as a result of trafficking in her images (or at least a sufficient portion of those losses). This is because Lily has already received far more than $1,251,297.13 in restitution from defendants in other cases,[8] and

---

177 (forensic psychological evaluation), 191–205 (vocational assessments), 211–254 (estimated lost wages), and 363–380 (attorney's fees and costs). [297-1.]

[8] Neither Lily nor the Government has provided the Court with information on precisely how much restitution Lily has received in other cases. Lily's supporting materials provide only that "[s]he has received

because section 2259—a restitution statute—does not authorize double recovery. Lily has attempted to support this request with a report prepared by Dr. Sharon Cooper, an expert on the effects that child pornography trafficking can have on victims. [297-1, 37–45.]

The report explains that Lily suffers from numerous health conditions, including asthma, endometriosis, migraine headaches, seizure disorder, Raynaud's syndrome, bilateral entrapment neuropathies, degenerative spinal disc and scoliosis with chronic back pain, hypothyroidism, and intermittent insomnia. [*Id.* at 40, ¶ VI.] Lily does not claim to suffer from any of these conditions as a result of trafficking in images of her abuse. [*Id.* at 5] ("While we do not claim that this defendant caused the underlying conditions, as Dr. Cooper explains, the continued downloading and distribution of her images causes an exacerbation and lengthening of these conditions."). Dr. Cooper explains that "the . . . downloading, trading and possession of" images of her abuse "clearly increases the severity of [her] health conditions" because of "the toxic role of chronically elevated serum cortisol levels in the victim[,] . . . which remains pathologically elevated in response to the ongoing psychological impact of the distribution of these abusive images." [*Id.* at 39, ¶ V.]

Dr. Cooper estimates the amount by which elevated levels of cortisol will increase the lifetime cost of treating each of Lily's conditions (except Raynaud's Syndrome). [*Id.* at 42.] Dr. Cooper assumes that Lily will live an average lifespan of 81 years and generally extrapolates lifetime costs by multiplying a projected annual increase in the cost of treating each condition (for some conditions she uses non-annual periods) by Lily's remaining life expectancy—60 years as of the creation of the report. For example, Dr. Cooper claims that trafficking in Lily's images will

---

payment for less than half of [her] losses." [297-1, 2.] Although the Government has informed the Court that courts have awarded Lily more than $14 million in restitution, [309, 1 n.1], the Court does not have information on how much money Lily has actually received under those orders. The most recent information the Court has been able to find was provided to the court in *United States v. Stivers*, 2020 WL 2804074 (S.D. Ind. May 29, 2020). The Government and Lily's representatives reported in that case that, as of mid-2020, Lily had received $1,892,935.45 in restitution. 2020 WL 2804074 at *3.

increase the cost of treating her asthma by $10,280 per year. Over 60 years, she estimates that this will result in $616,800 in increased medical expenses. [*Id.*]

As the Court explained in its supplemental briefing order, [300, 18–21], Dr. Cooper does not provide in-line citations or footnotes to medical or scientific literature after her projections. Rather, she compiles them in a table without elaboration, listing the fourteen references upon which she relies at the bottom of the report. Although this frustrated the Court's initial effort to scrutinize the basis for Dr. Cooper's projections, the Court has since directly examined the sources Dr. Cooper cites in her reference section. Regrettably, this review has uncovered significant flaws in the report that fatally undermine its reliability.

First of all, many of the report's annual cost projections misstate or misconstrue the findings of the studies from which they are taken. For example, Dr. Cooper projects that trafficking in Lily's images will increase the cost of treating her asthma by $10,280 per year. [297-1, 42.] The only reference that could conceivably support this estimate is a 2016 study of asthma patients cited at footnote 8. [*Id.* at 45.] But that study found that "[e]xcess costs in patients with asthma were $1028.0," not $10,280. Tavakoli *et al.*, *Ten-year trends in direct costs of asthma: a population-based study*, 72 ALLERGY 292, 293 (2017). The Court can only conclude that Dr. Cooper accidentally added a 0, a mistake that overestimates Lily's likely costs by $555,120.

To take another example, Dr. Cooper appears to derive her estimate that Lily's migraines will cost an additional $7,007 to treat per year from a study cited at footnote 9. This study found that migraine patients experience annual medical costs of $7,007 per year, versus the $4,436 incurred by those in a non-migraine control group. Hawkins *et al.*, *Direct Cost Burden Among US Insured Employees With Migraine*, 48 HEADACHE 553, 556 (2008). But this means that migraines increased the medical expenses of study participants by $2,571, not $7,007. Overlooking this fact,

15

the report relies on the $7,007 figure, resulting in a projection $266,160 greater than the evidence can properly support.

Similar mistakes abound. The Court need not discuss all of them because these flaws, as problematic as they may be, are not the biggest hole in the report's reasoning. To reiterate, neither Dr. Cooper nor Lily claim that trafficking in images of her abuse has caused any of her conditions, only that it will increase the cost of treating them. But the figures on which Dr. Cooper relies to project Lily's lifetime medical costs are generally pulled from studies reporting the total cost of treating each condition. This is not the proper analysis because Lily concedes that she would have incurred these expenses regardless of whether images of her abuse were circulated online. She only claims that she will have to pay some amount *more* than the baseline average for patients suffering from each condition. Because the report makes no effort to estimate this increase, it fails completely to support Lily's restitution request.

For these reasons, the Court finds the report insufficient to satisfy the Government's burden of proof under 18 U.S.C. § 3664(e). Therefore, Lily's total proven losses amount to just $1,251,297.13. Because Lily has already received this amount in restitution from defendants in other cases, the Court cannot award her restitution in this case.

B.    **Tara**

Tara, for her part, claims that trafficking in images of her abuse has caused her to suffer $147,148.78 in damages. Her supporting documentation breaks down her losses into the following categories:

1. "loss of housing for victim due to stalkers/harassers 2012" ($95,000.00);
2. "future counseling" ($26,400);
3. "[c]ounseling sessions/mileage 2008–2010" ($9,160.78);
4. "2008–2019 insurance prem" ($7,514.00);
5. "tracker phone for protection" ($5,328.00);

16

6. "expenses for PO Box to avoid harassment" ($3,500.00).
7. "2019 counseling expenses" ($219.00).

[312, 5.]

As with Lily, the Court must first determine whether Tara's supporting documentation is sufficient to prove each of these requests by a preponderance of the evidence. Although Tara has not relied on expert reports like Lily, her claimed losses do not involve the kinds of difficult, long-term estimates that might make such expertise necessary. Tara's claim that she has incurred $9,406.78 in past expenses (combining the reported figures for 2008–2010 and 2019) for psychological counseling is well-documented. Furthermore, the $26,400 she seeks to cover the cost of future counseling is reasonable and based on the advice of a licensed psychologist. [312, 6–7.] The Court also has no trouble accepting Tara's claim that harassment, which she describes at length in her victim impact statement, has forced her to spend $5,328.00 on a tracker phone and $3,500 on a P.O. box to protect her safety and privacy. Together, these amounts total $44,634.78.

Tara's remaining claims—for insurance premiums paid between 2008 and 2019 and for housing costs incurred after harassment forced her to leave her childhood home in 2012—give the Court pause. With respect to the insurance premiums, Tara does not explain whether she is seeking restitution for the full amount of the insurance premiums paid during that period, for an increase in those premiums resulting from medical needs caused by her initial abuse, or for an increase in those premiums resulting from medical needs caused by trafficking in images of that abuse. She simply seeks restitution for "2008–2019 insurance prem" without explanation. [*Id.* at 5.] *Paroline* permits Courts to include in a victim's general losses only those damages proximately caused by trafficking in images of her abuse. Tara has not provided the Court with the information it needs to make this finding. Therefore, the Court finds that the Government has not proven these losses by a preponderance of the evidence and will not include them in Tara's total loss figure.

17

With respect to Tara's claim for $95,000 in housing costs, Tara explains she has incurred expenses for temporary housing ever since harassment in 2012 forced her to leave her childhood home. [*Id.* at 3.] However, Tara's supporting materials provide no support for the amount of this request or any explanation of when it accrued. By contrast, Tara's original request for $22,400 explained that that amount accrued at a rate of $200 per month immediately after she left home in 2012. [182, 19.] The Court assumes this was a rough estimate, because even at $200 per month, Tara could only have suffered $17,800 in losses by the time she submitted that request in May of 2019. Regardless, the Court does not understand—and Tara provides no explanation—how or why her expenses for temporary housing increased by $72,600 in the time that elapsed between her original and supplemental requests.

Without such an explanation, the Court cannot find that Tara suffered these damages by a preponderance of the evidence, let alone determine whether those losses arose as a proximate result of trafficking in Tara's images. Nevertheless, the Court will include Tara's original $22,400 request in her total loss figure, for which Tara did, albeit briefly, provide an explanation. As the Court will explain below, however, it is highly dubious that Defendant can be held accountable for even these losses, which accrued from discrete acts of harassment pre-dating Defendant's offense conduct and that bear no real connection to his crimes. For now, though, the Court will include $22,400 in temporary housing losses in Tara's general losses, which brings her total proven losses to $67,034.78.

Because Tara appears to have received less than this in compensation from other restitution orders, [312, 5], the Court must proceed to step two. At this stage, the Court must "order restitution in an amount that comports with the defendant's relative role in the causal process" underlying Tara's "general losses." *Paroline*, 572 U.S. at 458.

Although *Paroline* did not explicitly address the relevance, if any, of the timing of a Defendant's offense conduct relative to a victim's losses, it stressed that section 2259 does not depart from "the bedrock principle that restitution should reflect the consequences of [a] defendant's own conduct . . . ." *Id.* at 454–55. Because it is hard to see how a Defendant could have any causal connection to losses accruing prior to his offense conduct, the Court has previously expressed skepticism that it can order Defendant to pay restitution for pre-offense losses. [300, 15–16.]

Several courts have held that, even after *Paroline*, such losses should be deducted from a victim's general losses. See, *e.g.*, *United States v. Lloyd*, 2020 WL 4038241, at *4 (N.D. Ohio July 17, 2020) ("After subtracting the costs that occurred prior to Defendant's conduct, the Court finds Tara's reasonable estimated losses to be $40,000."); *United States v. Moody*, 2018 WL 3887506, at *8 (S.D. Ga. Aug. 15, 2018) (noting that because many of the victim's "losses occurred long before this Defendant was arrested[,] . . . causation cannot exist"). This is consistent with the approach courts take to restitution generally. See, *e.g.*, *United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012) ("An award of restitution [under the MVRA] cannot compensate a victim for losses . . . caused by conduct that falls outside the temporal scope of the acts of conviction."). The Court agrees with the reasoning of these opinions and will deduct pre-offense conduct losses from Tara's general losses. Accordingly, the Court must deduct the $9,160.78 in expenses that Tara claims for psychological counseling she received between 2008 and 2010.

Tara's claim for housing expenses presents a closer question. Those losses appear to arise exclusively from harassment that Tara suffered in 2012, more than a year before Defendant's offense conduct in this case. To the extent Tara's housing costs can be characterized as damages arising from a single episode of pre-offense-conduct harassment, Defendant in this case could not

have had *any* causal role in bringing them about. In *United States v. Moody*, the Court deducted Tara's housing expenses from her total losses on this reasoning. 2018 WL 3887506, at *8 (noting that "it is difficult to connect the losses" Tara claim for temporary housing "to this Defendant, who was not arrested until November 2017.").

The Court agrees and will do the same. Things would be different if Tara claimed that some of these losses resulted from trafficking in her images, rather than discrete acts of harassment completed in 2012, but she does not. [312, 5] (claiming $95,000 for "loss of housing for victim due to stalkers/harassers 2012"). Defendant's offenses in this case simply could not have had any role, not even a "relative" one, in the "causal process underlying" these losses. *Paroline*, 572 U.S. at 458.[9]

Even assuming the Court could hold Defendant responsible for these costs, the Court further concludes that Defendant's offenses in this case are not a proximate cause of Tara's housing expenses. It is hard to see how the receipt and possession of images of Tara's abuse by Defendant in August 2013 has any connection, let alone a foreseeable one, to the intentional torts committed by Tara's harassers in 2012. Proximate causation cannot apply in reverse—it is nonsensical to say that losses accruing prior to an act are somehow within the set of risks created by that act. The very notion of risk implies that something may or may not occur. In *United States v. Lawson*, 2020 WL 4035105, at *2 (E.D. Ky. July 17, 2020), the Government itself took the position that Tara's housing expenses "should not be included in the calculation of [her] general losses," "because she [did] not indicate how the Defendant's actions contributed to this loss."

---

[9] For this reason, it makes no difference to the outcome of this opinion whether the Court includes the full $95,000 Tara claims for housing expenses in her general losses, rather than just the $22,400 she originally sought. All of these losses stem from a discrete episode of harassment pre-dating Defendant's offense conduct in this case, and would have to be deducted at this stage.

Because Tara has done no better in this case, the Court will deduct the remaining $22,400 Tara seeks for housing expenses from her losses. This deduction, coupled with the Court's earlier deduction of the $9,160.78 Tara claims for pre-offense counseling expenses, brings Tara's remaining losses down to $35,228.[10] Tara has already received restitution exceeding this amount. Therefore, the Court will not award her restitution in this case.

IV.     **Conclusion**

Both victims in this case have experienced unfathomable suffering, for which Defendant undoubtedly bears some measure of responsibility. Nevertheless, restitution orders are, and must always remain, "an application of law" rather than "a decisionmaker's caprice." *Paroline*, 572 U.S. at 462 (quoting *Philip Morris USA v. Williams*, 549 U.S. 346 (2007)). In this case, Lily and Tara's supporting materials are insufficient, as a matter of law, to prove that either has suffered compensable harm in excess of the restitution orders each has already received in other cases. For that reason, the Court will not order Defendant to pay restitution to either individual.

Dated: January 4, 2022

_____
Robert M. Dow, Jr.
United States District Judge

---

[10] In all likelihood, some amount of the costs Tara incurred to maintain a P.O box and purchase tracking software for her phone accrued prior to Defendant's offense conduct in this case. The Court need not address the difficult question concerning whether, and how, a court should attempt to temporally disaggregate losses that are not broken down into pre- and post-offense conduct amounts, because Tara's remaining losses are less than the amount she reports she has received in reimbursement. [312, 5.]